**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GEORGE HICKS,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN,<br>ACTING COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>　　　　　　Defendant. | Civil Action No. 2:15-cv-07221 (JLL)<br><br><br>**OPINION** |

**LINARES**, District Judge.

Before this Court is George Hicks ("Plaintiff")'s appeal, which seeks review of Administrative Law Judge ("ALJ") Donna Krappa's denial of Plaintiff's application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). The Court's jurisdiction to review Plaintiff's appeal falls under 42 U.S.C. § 405 (g) and pursuant to Local Civil Rule 9.1 (f) the Court resolves this matter on the parties' briefs. After reviewing the submissions of both parties, the Court AFFIRMS the final decision of the Commissioner of Social Security (the "Commissioner") for the reasons discussed below.

### I.　　BACKGROUND[1]

### A.  Procedural History

---

[1] "R." refers to the Administrative Record, which uses continuous pagination and can be found at ECF No. 9.

On October 13, 2011, Plaintiff applied to the Social Security Administration (the "Administration") for SSI benefits alleging disability as of December 22, 2007.[2] (R. at 118). The Administration denied Plaintiff's application and a subsequent request for reconsideration on March 26, 2012 and October 23, 2012, respectively.[3] (*Id.* at 12, 129, 144). In response, Plaintiff requested an administrative hearing; Plaintiff's request was granted and a hearing was held before ALJ Krappa on October 30, 2013. (*Id.* at 6, 82).

After the administrative hearing, ALJ Krappa issued a decision on April 28, 2014, rendering the Plaintiff not disabled within the meaning of the Act under Section 1614 (a)(3)(A). (*Id.* at 33). Thereafter, Plaintiff requested that the Appeals Council review the administrative decision; this request was subsequently denied thereby affirming the ALJ's decision as the final decision of the Commissioner. (Def.'s Br. 2). On September 30, 2015, Plaintiff initiated the appeal currently before this Court. (Pl.'s Br. 1).

### B. Factual Background

#### 1. Plaintiff's Testimony

On October 30, 2013, Plaintiff testified before ALJ Krappa. (R. at 87-108). During his testimony, Plaintiff, then 34-years-old, recounted a motor vehicle accident that occurred in December 2001 in which Plaintiff was a passenger. (*Id.* at 90). Immediately after the accident,

---

[2] The Court acknowledges that Plaintiff's application materials reflect an onset date of December 22, 2007. (R. at 119). And, further recognizes that the administrative decision refers to February 1, 2012 as the date Plaintiff's disability began. (*Id.* at 12). Plaintiff's brief requests Defendant stipulate the proper date as recorded in the initial SSI application. (Pl.'s Br. 32). Defendant makes this stipulation in its response brief. (Def.'s Br. 1 n.1). However, the Court does not find it necessary to address this issue since Plaintiff concedes it is only relevant if Plaintiff were to prevail and Defendant contends, notwithstanding the improper date, the pay period for SSI benefits would have remained the same. (Pl.'s Br. 32; Def.'s Br. 1 n.1).

[3] For purposes of clarity, the Court notes that the Disability Determination Explanation for Plaintiff's initial application and request for reconsideration reflect earlier determination dates than those cited herein. This is because a decision by the Administration is final as of the date of notice. (*See* R. at 119; 42 U.S.C. § 405; 20 C.F.R. §§ 404.901, 404.904.)

Plaintiff noted that he was admitted to the hospital and released later that night. (*Id.*).   In his testimony, Plaintiff explained that both his psychological and physical impairments resulted from the 2001 accident. (*Id.*).

Since the accident, Plaintiff testified that he sleepwalks. (*Id.* at 90, 93, 97).   Plaintiff's testimony attributed sleepwalking to nightmares that Plaintiff claimed occur three to four times a week. (*Id.*). Plaintiff testified that during his nightmares he relives the accident and that he injures himself every time he experiences a nightmare. (*Id.* at 91, 94).   An incident in Georgia occurred in which Plaintiff recounted "[he] was reliving [he] was in a car accident and [he] believe[s] it's the heat that triggers it and [he] just jump[ed] up, start[ed] screaming, [and] punching out windows." (*Id.*).   Because of this, Plaintiff stated that someone must be present when he goes to sleep to ensure that he does not jump out of his eighth floor apartment window. (*Id.*).   Plaintiff further testified that prior to the accident he had never before encountered sleepwalking episodes. (*Id.*). As a result, Plaintiff testified, he was previously seeing a psychiatrist, however, at the time of the testimony, Plaintiff stated that instead of psychiatric treatment, he was diagnosed with post-traumatic stress disorder ("PTSD") and prescribed medication to control his PTSD.  (*Id.*).

Regarding his physical pain, Plaintiff testified that at night he suffers from migraines at least three to four times a week; he explained that the migraines cause such severe pain that it awakens him from his sleep.  (*Id.* at 94).  He further testified that he is "in so much pain" as he also lacks any feeling in his hands and endures pain from his shoulder blades to his fingertips. (*Id.*).  Plaintiff stated during his testimony that he believes he is unable to lift a gallon of milk due to his weak grip and lack of feeling in his hand. (*Id.* at 96).  At times, Plaintiff stated, his legs are weak and therefore he is unable to walk any more than two blocks before his legs give out. (*Id.* at 94).  Furthermore, Plaintiff testified he "can't do a lot of walking.  [He] can't do a lot of sitting,

[he] can't do a lot of standing." (*Id.* at 95). Plaintiff elaborated that "if [his] life depended on it, [he could stand] for probably an hour" and is capable of sitting for a maximum of thirty minutes. (*Id.*). Plaintiff stated that these limitations are among the reasons that he is unable to work. (*Id.* at 94). With the exception of a brief employment at Purdue Farms as a layer pack, Plaintiff testified that he has barely worked over the past 15 years. (*Id.*). Regarding his job as a layer pack, Plaintiff asserted that he loved that job, however, he noted that he was unable to lift the boxes after a painful slip and fall on the job. (*Id.* at 89).

Plaintiff testified that he experiences pain from "head to toe" (*id.* at 91) and is therefore prescribed oxycodone, which he takes four times a day. (*Id.* at 89). Plaintiff testified that the severity of his pain is equivalent to an eight or nine on a scale of ten. (*Id.*). After taking his first dosage of oxycodone, Plaintiff testified that the pain will stop but then return two or three hours later; Plaintiff explained he must therefore take the medication four times a day. (*Id.*). Plaintiff testified that he is also prescribed proaire for asthma, clonodine for nightmares, floxetine for anxiety or depression, and gabapentin. (*Id.* at 92). However, Plaintiff testified that for his nightly migraines, he takes ibuprofen as he has not been prescribed any medication for this ailment. (*Id.* at 97).

During his testimony, Plaintiff stated that he is depressed, but does not have a problem getting along with others. (*Id.* at 102). Plaintiff testified that he "hears voices a lot." (*Id.* at 107). When "[he] walk[s] down the street, [he] [is] paranoid thinking people [are] out talking about [him] and stuff… ever[] since the car accident, that's what [he has] been experiencing." (*Id.*). Additionally, when Plaintiff is home alone, he "hear[s] voices. Sometimes [he] hallucinate[s]. [He] see[s] things." (*Id.*).

When describing his daily activities, Plaintiff testified that he needs assistance getting dressed, shaving and cooking. (*Id.* at 98).  Plaintiff explained that his daily routine consists of waking up around 6:00 or 7:00 a.m., and if not in pain, then exercising which includes bending over and touching his toes, jumping jacks and possibly five to six sit-ups. (*Id.* at 100).  After a breakfast of fresh fruit, eggs, bread and milk, Plaintiff testified that he reads a book or attempts to do household chores, however, due to the lack of feeling in his hands Plaintiff explained this is "too much to bear." (*Id.*).  Therefore, according to the Plaintiff, "when people come over and help [him, he just has] to sit back and let them do what they do." (*Id.* at 101).  Plaintiff proceeded to testify that since August 2013 he has attended a mental health program five days a week from 9:00 a.m. to 3:30 p.m. to treat his PTSD; he noted he also sees a psychiatric about once or twice a week. (*Id.*).  Plaintiff stated that someone comes to cook for him about four to five times a week and then he goes to bed around 8:00 p.m. (*Id.* at 103).

## 2.  Medical Evidence

A week after the 2001 motor vehicle accident, Plaintiff visited the emergency room ("ER") seeking medical attention due to constant neck and back pain for which he was diagnosed with a back sprain and prescribed ibuprofen. (R. at 18).  On March 14, 2002, an electrodiagnostic test performed on the Plaintiff reflected right cervical radiculopathy at the C7-C8 level and ruled out bilateral upper dorsal radiculopathy. (*Id.* at 19).  Later, on March 28, 2002, Dr. Enrique Hernandez, M.D., affirmed Plaintiff had been under his care and opined Plaintiff had been "totally disabled from December 22, 2001, to May, 1 2002 due to head and spine trauma from a motor vehicle accident and cervical radiculopathy." (*Id.*). Tests performed on April 3, 2002 demonstrated that Plaintiff's bilateral L5 and S1 segmental responses were normal from the cerebral cortex. (*Id.*).

From June 2002 through October 2010, Plaintiff made a series of ER visits, which revealed Plaintiff suffered from insomnia, depression, anxiety disorder, nightmares and asthma. An ER visit, on June 10, 2002, for a rash on his arms and legs, revealed that Plaintiff had a steady gait and full range of motion.  On May 18, 2003, Plaintiff overdosed on cold medicine and muscle relaxants by taking 20 and 10 pills, respectively, "with the intent to get high." (*Id.*).

On July 27, 2009, Plaintiff was admitted to the ER "for sleepwalking and generalized body pain." (*Id.*).  At this visit, Plaintiff was diagnosed with insomnia, organic, NOS, a Global Assessment of Functioning ("GAF") score of 60, a history of depression and cervical radiculopathy for which he was prescribed Vistaril and Tramadol. (*Id.*).  Recorded in the ER report, Plaintiff exhibited "full range of motion of the extremities, normal motor function, and normal sensation." (*Id.*).  Plaintiff asserted that he suffered from insomnia since the 2001 motor vehicle accident and that the accident also caused him to experience nightmares, flashbacks of the accident, sadness, a decreased appetite and low energy levels. (*Id.*).  However, it was noted that Plaintiff did not avoid the location of the accident and did not undergo inpatient psychiatric treatment. (*Id.*).  The last time Plaintiff received psychotherapy was in 2002. (*Id.*).  The report concluded that Plaintiff was able to return to work or school in two days absent any restrictions. (*Id.*).

Again, on August 4, 2009, Plaintiff was treated in the ER for sleepwalking on a referral from University Behavioral Health Care ("UBHC") for psychiatric stabilization.  (*Id.*).  At this visit, Plaintiff was diagnosed with anxiety disorder, NOS rule out impulse control disorder with a GAF of 61-70, PTSD and psychotic disorder were also noted. (*Id.*).  Thereafter, Plaintiff was admitted to the ER three more times, on September 23, 2009, April 16, 2010 and October 13, 2010.  (*Id.*). On a referral from UBHC for psychiatric screening, the September 2009 ER treatment

assessment indicated that the Plaintiff suffered from depressive disorder, anxiety disorder, and

NOS with a GAF of 55-60. (*Id.*).  The April 16, 2010 visit was due to a superficial facial injury

and at the October 13, 2010 visit, Plaintiff sought treatment for acute bronchitis.  Here, Plaintiff

reported a history of asthma, that he was a smoker and that he subsequently ran out of asthma

medication. (*Id.*).

On May 25, 2011, after complaining of lower back and neck pain, Dr. Joseph Dituro, M.D.,

diagnosed the Plaintiff with lumbar and cervical sprain and strain. (R. at 21, 464).  A report of an

MRI performed on the Plaintiff's lumbar spine revealed L2-3 and L3-4 minimal to mild spinal

stenosis secondary to congenital pedicle shortening, facet joint hypertrophy and disc bulging, and

L4-5 and L5-S1 tiny and small central disc herniations. (R. 21, 325-7, 450-3, 740-67).  Also

dated May 25, 2011, a report of an MRI performed on Plaintiff's cervical spine uncovered

straightening of the cervical curve and mild disc degenerative changes at C2-3 and C3-4 absent

any spinal cord compression or neural foraminal stenosis. (*Id.*).

A June 6, 2011 report indicated Plaintiff suffered from an upper respiratory

infection/pharyngitis and degenerative disc disease of the cervical spine.  On July 7, 2011 and,

again on August 2011, Plaintiff sought that his medications, including Percocet, be refilled; the

records note that the Plaintiff appeared to be "drug seeking."  (*Id.* at 21).

In November of 2011, Dr. Ivan Baraque, M.D., of Family Medical Group Services, reported

in a "Residual Functional Capacity Questionnaire" that Plaintiff complained of lower back pain,

chronic neck pain and radiculopathy as a result of the 2001 accident. (*Id.* at 836-40).   Dr.

Baraque noted that Plaintiff characterized the intensity of pain as an eight on a scale of ten.  (*Id.*).

Also noted in the report, Plaintiff stated that his pain worsened when bending, lifting and

carrying heavy objects.  (*Id.*).  Dr. Baraque recorded that flexion of Plaintiff's lower back was at

75 degrees and extension was 20 degrees. (*Id.*).  In this report, Dr. Baraque opined that Plaintiff's condition allowed him to lift and carry 20 pounds occasionally, stand and walk less than two hours in an eight-hour day and sit less than two hours in an eight hour day. (*Id.*).  It was further noted that, in Dr. Baraque's opinion, Plaintiff would need to alternate between sitting, standing and walking and take ten to fifteen minute unscheduled breaks five to six times a day in an eight hour day. (*Id.*).  Dr. Baraque also reported that, in his opinion, it is likely that the Plaintiff would be absent from work over four days per month. (*Id.*).  In the analysis, it is indicated that these limitations are based on the claimant's self-report. (*Id.*).

The following month, in December of 2011, Dr. Dituro, in his progress notes dated May 12, 2011 through December 22, 2011, reported that Plaintiff complained of lower back pain radiating down both legs.  (*Id.* at 337-42).  It was further reported that Plaintiff's positive straight leg raising was at 10/15 degrees and degenerative disc disease of the cervical spine, two lumbar disc herniations, upper respiratory infection and pharynigitis.  Plaintiff was prescribed Percocet and a Z-Pack. (*Id.*).

At the request of the Commissioner, Dr. Alexander Iofin, M.D., performed a psychiatric consultative examination of the Plaintiff on February 22, 2012. (*Id.* at 425-8).  Dr. Iofin reported that since the 2001 motor vehicle accident, Plaintiff indicated he has experienced psychotic ideations when significantly depressed, mood swings, insomnia, nightmares, sleepwalking, irritability, problems concentrating, anxiety, panic attacks, feelings of hopelessness and helplessness and also hears voices. (*Id.*).  Plaintiff attributed these psychiatric issues to his chronic pain beginning after the motor vehicle accident. (*Id.*).  Dr. Iofin opined that Plaintiff suffered from "mood disorder secondary to orthopedic problems and chronic pain with bi-polar type features," "anxiety disorder secondary to orthopedic problems and chronic pain with

generalized anxiety and panic attacks," "specific phobia, fear of driving," and "sleepwalking." (*Id.* at 427-8). Dr. Iofin assigned Plaintiff a GAF of 56 and recommended follow up with mental health professionals. (*Id.* at 428).

Thereafter the Commissioner retained Dr. Justin Fernando, M.D., to perform a consultative examination of the Plaintiff on February 27, 2012. Dr. Fernando's report indicated Plaintiff exhibited a normal gait and station and was able to walk on his heels and toes, intact hand and finger dexterity bilaterally, 5/5 grip and pinch strength bilaterally, full motion of the cervical and lumbar spines. (*Id.* at 24).

In March 2012, an MRI of Plaintiff's left shoulder revealed arthrosis of the AC joint, severe tendinosis of the distal supraspinatus, subdeltoid and subacromial bursitis, moderate tendinosis of the intraspinatus, and abnormal signal in the glenoid labrum without tear. (*Id.*). Another March 2012 report of an MRI of Plaintiff's lumbar spine indicated L2-L3 disc bulge mildly flattening the thecal sac, L3-4 disc bulge encroaching on the ventral theca and flattening it mildly and an L4-5 protrusion indenting the ventral theca mildly. (*Id.*). Also reported in March 2012, nerve conduction testing exposed right cervical radiculopathy at C7-C8, ruling out bilateral upper dorsal radiculopathy. (*Id.*). On March 30, 2012, Plaintiff was prescribed Percocet and referred to pain management for lumbar radiculopathy. (*Id.* at 437-49). Plaintiff requested a refill of his pain medication on April 3, 2012 from Dr. Dituro, however, it was noted that two weeks prior Plaintiff had seen another physician for pain in his left shoulder, lower back and neck. (*Id.*). In response, Plaintiff denied receiving treatment or medication from another doctor and asserted he would only seek medical treatment from Dr. Dituro. (*Id.*). Plaintiff was then prescribed Percocet and Diazepam. (*Id.*). Progress notes dated May 3, 2012, indicated Plaintiff's drug screen as positive for marijuana and negative for Oxycodone; Plaintiff stated he

had used marijuana two days earlier. (*Id.*). Plaintiff was prescribed Percocet, instructed to return

for a follow-up within two weeks and advised that if at the follow-up his drug screen was

inconsistent with treatment, he would consequently be released from care. (*Id.*).

On May 2, 2013, Plaintiff saw Dr. Silvio Quaglia, M.D., for neck, left shoulder and back

pain. (*Id.* at 26). On June 20, 2013, electrodiagnostic testing uncovered evidence of neuropathy

in the upper extremities and on August 15, 2013 uncovered evidence of neuropathy in the lower

extremities. (*Id.* at 841-50). In September 2013, Dr. Quaglia provided an opinion to complete a

form for the State of New Jersey for the purpose of maintaining Plaintiff's welfare benefits; Dr.

Quaglia's opinion included his estimation that Plaintiff was disabled from September 12, 2013 to

September 12, 2014. (*Id.* at 26, 821-22). Dr. Quaglia further reported that Plaintiff was unable to

stand, walk, climb, stoop, stand or sit and that Plaintiff suffered from cervical disc displacement,

brachial neuritis, lumbar disc displacement, and lumbosacral neuritis. (*Id.*).

In December 2013, Dr. Beverly Taitt completed a Manipulative Impairments RFC

Questionnaire in which Dr. Taitt opined that Plaintiff's use of his hands and arms were severely

restricted due to cervical radiculopathy and tendinosis in his left shoulder. (*Id.* at 871-72). Dr.

Taitt further asserted that she had treated the Plaintiff since June 2013 and also specified that

Plaintiff suffered from the impairments noted in the Questionnaire since March 2002. (*Id.*).

## II.   STANDARD OF REVIEW

This court must affirm the ALJ's decision if it is supported by substantial evidence. 42

U.S.C. §§ 405(g), 1383(c)(3); *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). "Substantial

evidence means such relevant evidence as a reasonable mind might accept as adequate to support

a conclusion," and "[i]t is less than a preponderance of the evidence but more than a mere

scintilla." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). The "substantial evidence

standard is a deferential standard of review." *Id.* The ALJ is required to "set forth the reasons for his decision" and not merely make conclusory unexplained findings. *Burnett v. Comm'r of Soc. Sec,* 220 F.3d 112, 119 (3d Cir. 2000). But, if the ALJ's decision is adequately explained and supported, the Court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan,* 970 F.2d 1178, 1182 (3d Cir. 1992). It does not matter if this Court "acting *de novo* might have reached a different conclusion" than the Commissioner. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986)). Finally, the Third Circuit has made clear that "*Burnett* does not require the ALJ to use particular language or adhere to a particular format in conducting his [or her] analysis. Rather, the function of *Burnett* is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." *Jones*, 364 F.3d at 505.

## III.    THE FIVE STEP EVALUATION PROCESS TO DETERMINE DISABILITY UNDER THE ACT

The Social Security Act authorizes the Administration to pay a period of disability, disability insurance benefits and supplemental security income to disabled individuals. 42 U.S.C. §§ 423 (a); 1382. Pursuant to the Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A person is unable to engage in substantial gainful activity when his physical or mental impairment(s) are "of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Regulation promulgated under the Act sets forth a five-step process to be used by the ALJ to determine whether or not the claimant is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520(a)(1), 416.920(a)(1). The claimant bears the burden of proof at steps one through four whereas the Administration bears the burden at step five. *Poulos v. Comm'r of Soc. Sec.,* 474 F. 3d 88, 92 (3d Cir. 2007) (citing *Ramirez v. Barnhart,* 372 F. 3d 546, 550 (3d Cir. 2004)). The first step in the sequential evaluation process requires that the ALJ determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a). If it is found that the claimant is engaged in substantial activity, the disability claim will be denied. *Bowen v. Yuckert,* 482 U.S. 137, 140 (1987). Alternatively, if it is found that the claimant is not engaged in substantial gainful activity the evaluation proceeds to step two. (*Id.*). At step two, the ALJ must determine whether the claimant suffers from a severe impairment. 20 C.F.R. § 404.1520(c). If the claimant fails to show that her impairments are "severe," she is ineligible for disability benefits. However, if the ALJ finds that the showing indicates claimant's disability is severe, the analysis proceeds to step three. At step three, the ALJ then evaluates whether the claimant's severe impairment is listed or is equivalent to an impairment set forth by the Code. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four. Step four requires that the ALJ make specific findings of fact as to the claimant's residual functional capacity and also as to the mental and physical demands of the claimants past relevant work. After both of these finding are made, the ALJ must compare the RFC to the past relevant work to determine whether Claimant retains the RFC to perform the past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to her past relevant work. *Adorno v. Shalala,* 40 F.3d 43, 46 (3d Cir.1994). If at step four, the evaluation indicates that the claimant is unable to resume

past relevant work or any employment history does not qualify as past relevant work, the evaluation moves to step five. *Jones*, 364 F.3d at 503. The final step shifts the burden of proof to the "Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience and [RFC]." *Ramirez*, 372 F.3d at 551; 20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. *Jones*, 364 F.3d at 503.

Additionally, under the Act, disability must be established by objective medical evidence. To this end, "[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section." 42 U.S.C. § 423(d)(5)(A). Instead, a finding that one is disabled requires:

> [M]edical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph . . . would lead to a conclusion that the individual is under a disability.

*Id.*; *see* 42 U.S.C. § 1382c(a)(3)(A). Factors to consider in determining how to weigh evidence from medical sources include: (1) the examining relationship; (2) the treatment relationship, including the length, frequency, nature, and extent of the treatment; (3) the supportability of the opinion; (4) its consistency with the record as a whole; and (5) the specialization of the individual giving the opinion. 20 C.F.R. § 404.1527(c).


## IV.     DISCUSSION

After administering the five-step evaluation process, ALJ Krappa concluded that the Plaintiff was not disabled as defined by the Act. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged date of onset. (R. at 15). At step two, ALJ Krappa found that Plaintiff suffered from "the following severe impairments: a disorder of the back (cervical and lumbar); affective disorders (administering often through anxiety and PTSD); and asthma." (*Id.*). Notwithstanding the determination at step two, the ALJ found at step three that these impairments or a combination of these impairments neither met nor medically equaled in severity to any of the impairments listed in the Act's promulgating regulations. (*Id.* at 15, citing 20 CFR part 404, Subpart P, Appendix 1).

Next, at step four, since Plaintiff did not have past employment that qualifies as "prior relevant work" under the Regulations, the ALJ decided that it was unnecessary to determine whether the Plaintiff would be able to return to prior relevant work under the residual functional capacity and to proceed to step five. At this final step, after consideration of the entire record, ALJ Krappa found that the Plaintiff is capable of exertional demands of light work as defined under the Regulations. Specifically, the medical consultant of the Disability Determination Services ("DDS")'s found that Plaintiff is able to:

> Lift/carry 20 lbs. occasionally and 10 lbs. frequently; stand/walk for 6 hours in an eight hour work day; sit for 6 hours in an eight hour work day (if when seated during the workday he is given the opportunity at the 45 min.-1 hr. mark to stand and stretch for 3-5 minutes); and perform unlimited pushing and pulling within the given weight restrictions.

> Moreover, regarding the *postural and environmental demands* of work, [the ALJ found] that the claimant is able to perform jobs: that require only occasional use of ladders, ropes, or scaffolds; that require only occasional use of ramps or stairs; and that require occasional balancing, stooping, kneeling, crouching, and/or crawling. Furthermore, as to the mental demands of work, [the ALJ found] that the claimant is able to perform jobs: that are simple and repetitive; and that require only an occasional change in decision making required during the workday.

(*Id.* at 17). In making the final determination, the ALJ also heard testimony of vocational expert, Mr. Rocco J. Meola ("Mr. Meola"). Mr. Meola opined, taking into account all the factors, that the Plaintiff would be able to perform the requirements of the following jobs: ticketer, bagger and produce weigher. (*Id.* at 32). ALJ Krappa credited the vocational expert testimony to be consistent with the Dictionary of Occupational Titles and based on this testimony ultimately determined a significant number of jobs are available to Plaintiff notwithstanding his impairments. (*Id.*). Plaintiff argues that the ALJ erred in her analysis at step two by failing to include additional impairments as severe and also by failing to give adequate weight to the opinions of Plaintiff's treating physicians. (Pl.'s Br. 26, 33).

### A. ALJ Krappa Did not Err As a Matter of Law as Step Two

Plaintiff argues ALJ Krappa erred as a matter of law at step two by failing to characterize as severe the following impairments: upper extremity neuropathy, shoulder tendinosis, and chronic headaches. (*Id.* at 27). The Court disagrees.

A diagnosis alone does not support a finding that an impairment is severe. *See Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 (3d Cir. 2007). In addition, a showing is required that the diagnosis results in a limitation disabling the Plaintiff from performing basic work activities or an impairment limiting the capacity to cope with the mental demands of employment. ((*Id.*) (emphasis in original) (citing 20 C.F.R. §§ 404.1520(c), 404.1521(a); *Ramirez*, *supra* at 551)). The burden to establish severity in this regard is on the Plaintiff. *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

Plaintiff, herein, has failed to meet his burden of showing that the diagnoses of upper extremity neuropathy, shoulder tendinosis, and chronic headaches limit his ability, either mentally or physically, to engage in basic work. Instead, Plaintiff does exactly what Third

15

Circuit precedent and the regulations forewarn of – notwithstanding Plaintiff's adequate description of the diagnoses, the additional requirement demonstrating the affect these impairments would have on Plaintiff's ability to work is absent.

Plaintiff also argues that because the ALJ did not find the upper extremity or the headache impairments to be severe at step two, this lead to an improper evaluation at the fourth and fifth steps. Even if the ALJ had in fact erred with respect to one of the impairments that she found to be non-severe, such error would be harmless since she found other impairments to be severe, engaged in the full five-step evaluation, and accounted for related possible limitations in her RFC finding. *See Salle*, 229 F. App'x at 145 n.2 ("Because the ALJ found in Salles's favor at Step Two, even if he had erroneously concluded that some of her other impairments were non-severe, any error was harmless.") (citing *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005)).

### B. Substantial Evidence Supports the Weight the ALJ Afforded to the Medical Opinions

Plaintiff argues that the ALJ failed to accord greater weight to the medical opinions of the Plaintiff's treating physicians thereby failing to comply with 20 C.F.R. 416.927 and allocated too much weight to non-treating physicians. In support of this argument, the Plaintiff claims the ALJ gave little weight to the November 2011 opinion of Dr. Baraque, September 2013 opinion of Dr. Quaglia, and December 2013 opinion of Dr. Taitt. (Pl.'s Br. 34). The Plaintiff further alleges that the ALJ relies at times on the opinion of consultative examiner Dr. Fernando to discredit later opinions of treating physicians. The crux of Plaintiff's argument is that the ALJ commits error by failing to specifically accord weight to Dr. Fernando's opinion and improperly relies on Dr. Fernando's finding to discredit the opinions of both Dr. Taitt and Dr. Quaglia while

Dr. Fernando's opinion predated the treating physicians' opinions and lacked the benefit of reviewing all objective medical testing. The Court finds Plaintiff's argument unpersuasive as substantial evidence supports ALJ Krappa's findings.

### i.    Dr. Taitt

Contrary to Plaintiff's argument, Third Circuit precedent sets forth that "the ALJ [is required to] indicate that s/he has considered all the evidence, both for and against the claim, and provide some explanation of why s/he has rejected probative evidence which would have suggested a contrary disposition. . . . [T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *See Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981). Accordingly, ALJ Krappa explains:

> In a reported dated December 2, 2013, Dr. Taitt indicated that the claimant is unable to perform any gross or fine manipulations with his hands. Dr. Taitt stated that the earliest date of the limitations found in her report was March 28, 2002; however, she did not see the claimant until June 2013. [The ALJ gave] this opinion no weight. The consultative examiner Dr. Fernando found intact hand and finger dexterity bilaterally and 5/5 grip and pinch strength bilaterally. Moreover, as noted above, [the ALJ] refuse[d] to give great weight to the opinions of Dr. Quaglia as expressed in the Work Force New Jersey form, it is interesting to note that Dr. Quaglia checked every box regarding impairment in the claimant's use of his hands; moreover, Dr. Baraque noted no problem with use of claimant's hands. Accordingly, I give little weight to Dr. Taitt's opinion under 20 C.F.R. § 416.927. (R. at 31).

ALJ Krappa's allocation of weight to Dr. Taitt's medical opinion is based on substantial evidence as her opinion clearly indicates that she has considered the evidence and presented reasoning in the determination.

### ii.    Dr. Baraque

In November 2011, Dr. Baraque opined that the claimant is disabled in Plaintiff's RFC report. (R. at 836-40). Plaintiff concedes that Plaintiff's subjective complaints assisted in the

report, but further argues that there is no indication that the report does not take into account the Plaintiff's other medical records. (Pl.'s Br. 35).   The Court does not find this argument persuasive. Further, it is not the role of this Court to "weigh the evidence or substitute its conclusions for those of the fact-finder" and "even if [this] Court would have decided the factual inquiry differently," the Court must not set aside the administrative decision. *Williams*, 970 F.2d at 1182; *Hartranft*, 181 F.3d at 360.   Rather the Court must determine if the ALJ's finding is supported by substantial evidence by reviewing the evidence in its totality. *Daring v. Heckler*, 727 F 2d. 64, 70 (3d Cir. 1984).   The Court finds that ALJ Krappa's decision, when viewed in its totality, is based upon substantial evidence.

A subjective complaint alone cannot establish disability; objective medical evidence must be provided. 20 C.F.R. §§ 404.1528(a), 1529(a), 416.928(a); *see also Prokopick v. Comm'r of Soc. Sec, 272 F. App'x.*, 196, 199 (3d Cir. 2008).   Instead, the ALJ must consider 'all of the available evidence' when evaluating the intensity and persistence of a claimant's symptoms, including objective medical evidence and a claimant's statements about his symptoms. 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); *see also Hartranft*, 181 F.3d at 362 (3d Cir. 1999) ('This obviously requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it.').   However, an ALJ is not required to accept Plaintiff's testimony without question.   The ALJ has discretion to evaluate Plaintiff's credibility and render an independent judgment in light of the medical findings and other evidence regarding the true extent of the alleged symptoms. *Malloy v. Comm'r of Soc. Sec.,* 306 F. App'x. 761, 765 (3d Cir. 2009) ("Credibility determinations as to a claimant's testimony, regarding pain and other subjective complaints are for the ALJ to make.") (citing *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983)).   Dr. Baraque indicates that the limitations

identified, such as the need to take unscheduled breaks of 10-15 minutes 5 to 6 times in an 8 hour

day, are all based not up his consideration of the medical record, but upon the claimant's self-

report. (R. at 30).  In making her determination, ALJ Krappa rendered a detailed opinion

discussing in detail each report in the administrative record.  As such, ALJ Krappa's decision in

according little weight to Dr. Baraque's report is supported by substantial evidence since the

credibility determination of the report was found to be based on the Plaintiff's self-report. (*Id.*).

### iii.   Dr. Quaglia

Regarding Dr. Quaglia's report dated September 12, 2013, this report estimated that the

Plaintiff would be disabled prospectively for a year from September 12, 2013, to September 12,

2014. The ALJ gave this opinion little weight under 20 C.F.R. § 416.927 (*Id.* at 30).  The ALJ

provides substantial evidence to support her reasoning for according little weight to Dr.

Quaglia's report as the decision explains that the two page state form requires the doctor to check

off boxes to specify whether the patient is able to stand, walk, climb, stoop, bend, lift, use hands

or other. (*Id.*).  ALJ Krappa points out that the form does not require reference nor the support of

objective medical evidence so therefore the determination may be based on the subjective

complaints of the patient. (*Id.*).  Here, Dr. Quaglia failed to explain the extent of any of chosen

postural limitations. (*Id.*).   Further, the ALJ explains that because the state welfare officials use a

different standard for evaluating which impairments constitute a disability, such that the "federal

regulations is not based upon 'diagnoses' alone (as it appears from the form) but upon the extent

of the physical limitations that the diagnoses may cause. Furthermore, the federal disability

determination includes a determination regarding the availability of jobs, if any, that the person

might be able to perform despite his or her limitations. (*Id.*).  ALJ Krappa agreed that the

Plaintiff may suffer from the impairments as noted on the state form, however, the ALJ further

clarified that "while this information may be of some value (as described above), it is not determinative on the issue of legal disability under the Regulations." (*Id.*). Because ALJ Krappa has provided more than a mere scintilla of evidence in support of this finding and it is not the role of this Court to reweigh the evidence and reach its own conclusions, the Court affirms ALJ Krappa's decision on this issue. *Williams*, 970 F.2d at 1182.

V.     **CONCLUSION**

The Court has reviewed the entire record and for the foregoing reasons concludes that

ALJ Krappa's decision that the Plaintiff is not disabled is supported by substantial evidence.

Accordingly, ALJ Krappa's decision is affirmed.  An appropriate Order follows this Opinion.

DATED:  October ___13___, 2016

JOSE L. LINARES
UNITED STATES DISTRICT JUDGE